UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

——————————————————————————

GCCA, LLC,                                          21-cv-5022 (JGK)

                  Plaintiff,

      - against -                            **MEMORANDUM OPINION**

MACCG, LLC,                                         **AND ORDER**

                Defendant.

——————————————————————————

This lawsuit involves a dispute over the use of a design mark and a word mark for "TAVERNA KYCLADES" by a restaurant in the East Village in New York City. The plaintiff, GCCA, LLC ("GCCA") which is owned in equal shares by Mr. Ardian Skenderi ("Mr. Skenderi") and his spouse, Mrs. Caterina Skenderi ("Mrs. Skenderi"), has trademark rights for both marks, including a registered trademark for a design mark including the words "TAVERNA KYCLADES." GCCA claims that the marks are being infringed by their use by the East Village restaurant, which is operated by the defendant, MACCG, LLC ("MACCG"), which in turn is owned equally by Mr. Skenderi and Mr. William Pappas ("Mr. Pappas").

MACCG claims that it has the right to use the marks because the marks have allegedly been licensed to it irrevocably or assigned to it, although there is no documentation to support either contention. MACCG also claims that there can be no

1

confusion between the use of the marks by MACCG for the East Village restaurant and the use of the marks by the two other restaurants run by GCCA because Mr. Skenderi is a 50 percent owner of both GCCA and MACCG, even though the entities are separate and GCCA owns the marks.

GCCA has sued MACCG for trademark infringement, in violation of 15 U.S.C. § 1114, federal unfair competition in violation of 15 U.S.C. § 1125(a), trademark dilution in violation of 15 U.S.C. §1125(c), and common law unfair competition. See Compl., ECF No. 1. MACCG has denied that GCCA has established the elements of those claims and has asserted counterclaims for declaratory judgment of non-infringement of trademarks and cancellation of a trademark registration. See Answer, ECF No. 10 at 17 ¶¶ 56-67.

The Court conducted a non-jury trial on November 1 and November 2, 2023. The Court now makes the following Findings of Fact and reaches the following Conclusions of Law:

**FINDINGS OF FACT**

1. GCCA is a limited liability company organized and existing under the laws of the State of New York, with a place of business located at 25-62 Gaskell Road, Little Neck, NY 11362. It was incorporated on or about August 5, 2013. Pl.'s Tr. Ex. 23.

2. GCCA is owned by its two members, Mr. Skenderi and Mrs. Skenderi. Trial Tr. 220-21.

3. MACCG is a limited liability company organized and existing under the laws of the State of New York with a place of business located at 400 East 14th Street, New York, NY 10009. It was incorporated on or about April 15, 2013. Pl's Tr. Ex. 22.

4. MACCG is owned by its two members, Mr. Pappas and Mr. Skenderi, in equal 50 percent shares. Mr. Pappas is a silent partner, not active in MACCG's business. Trial Tr. 17, 19-20, 66, 236.

5. In late 1995/early 1996, after emigrating to Astoria, Queens, from Albania, Mr. Skenderi began working in a popular Greek restaurant in Astoria, "Stamatis." He started at Stamatis doing odd jobs and eventually became the cook at the restaurant. Id. 52-56.

6. A restaurant operating under the name "TAVERNA KYCLADES" opened in the Astoria section of Queens, New York in or about

1996 and has been in continuous operation in Astoria under that name since that date. Id. 56.

7. Mr. Skenderi worked at Stamatis for 2.5 years, before being recruited by George Mandilaras, the owner of the TAVERNA KYCLADES restaurant, to become the chef at TAVERNA KYCLADES. Id. 57-58.

8. Mr. Skenderi began employment as a chef at TAVERNA KYLCADES beginning in approximately 1998. At that time, TAVERNA KYCLAES was a small restaurant, not very busy in the fall and winter months and only somewhat busier in the spring and summer when additional tables were placed outside. Id. 59.

9. Mr. Skenderi met Mrs. Skenderi in December 1998 and they married in 2001. Id. 179-81.

10. In January 2001, the TAVERNA KYCLADES restaurant and the rights to the TAVERNA KYCLADES trademark for restaurant services were acquired by Ardian Corporation, whose sole owner is Mrs. Skenderi. The sale of the TAVERNA KYCLADES restaurant and the TAVERNA KYCLADES trademark from Mr. Mandilaras to Ardian Corporation occurred before Mr. and Mrs. Skenderi were married. Id. 63-65, 93, 181-83, 188-89.

11. After purchasing the restaurant, Mrs. Skenderi joined her husband working at TAVERNA KYCLADES, hosting, taking orders, and doing the bookkeeping. Id. 183-84.

12. Since 2001, Ardian Corporation and its successors in interest have owned the Astoria restaurant and used the associated TAVERNA KYCLADES trademark continuously. Mr. Skenderi has been the executive or head chef, overseeing the staff, creating the menu, and ensuring the quality of the food served throughout that period. Id. 87, 96, 141, 217.

13. From 2001 to 2013 Ardian Corporation was the sole owner of, and continuously used, the trademark TAVERNA KYCLADES in connection with restaurant services. Id. 204-05.

14. In 2011, Ardian Corporation had the TAVERNA KYCLADES logo then in use redesigned for the TAVERNA KYCLADES restaurant (the "TAVERNA KYCLADES design mark"). Mr. and Mrs. Skenderi began using the TAVERNA KYCLADES design mark featured below in connection with their Astoria TAVERNA KYCLADES restaurant and associated services:



The TAVERNA KYCLADES restaurant in Astoria has used the redesigned logo continuously from 2011 to the present. Id. 95-96, 206-07. The TAVERNA KYCLADES word mark and TAVERNA

KYCLADES design mark are referred to collectively herein as the "TAVERNA KYCLADES Trademarks."[1]

15. In April 2013, Mr. and Mrs. Skenderi formed GCCA, LLC, to own the TAVERNA KYCLADES Trademarks. Pl.'s Tr. Ex. 23; Trial Tr. 205. Earlier, they had been advised by their financial advisor that they should protect the valuable TAVERNA KYCLADES name by registering the TAVERNA KYCLADES trademarks. Trial Tr. 89-90, 188, 205.

16. In 2013 GCCA acquired the TAVERNA KYCLADES word and design marks from Ardian Corporation. Id. 205-06.

17. GCCA has made continuous use of the TAVERNA KYCLADES marks in connection with restaurant services at the Astoria restaurant since that acquisition. Id. 96, 217.

18. On November 25, 2013, GCCA filed an application to register the TAVERNA KYCLADES word and design marks in class 43 in connection with restaurant services based on the first use of the design mark in 2011, and the first use of the words

---

[1] This Memorandum Opinion and Order refers to the plural "TAVERNA KYCLADES Trademarks, trademarks, or marks" because there is no dispositive difference between the singular and plural in this case, and the trademark protections apply collectively to the name of the restaurant and to the design, when they are used together. The name of the restaurant, TAVERNA KYCLADES, has been in use since 2001, see Compl. ¶ 11, and the trademark registration states that "the mark consists of the wording 'TAVERNA KYCLADES' with a stylized image of a fish appearing between the wording, and with a series of wave designs appearing below the foregoing." Compl. Ex. 1-1.

TAVERNA KYCLADES more than ten years before the application was filed. Id. 94. The trademark registration, U.S. Trademark Registration No. 4,583,405, for the TAVERNA KYCLADES word and design marks was issued to GCCA on August 12, 2014. Pl's Tr. Exs. 1, 2; Trial Tr. 208.

19. MACCG argues that GCCA falsely represented to the United States Patent and Trademark Office ("USPTO") that GCCA was the owner of the TAVERNA KYCLADES marks when GCCA knew that it had "verbally assigned any and all common law rights in the TAVERNA KYCLADES trademarks" to MACCG. ECF No. 151 ¶ 60. There is no document and no credible testimony that such assignment had occurred and no evidence that any false statement was made in the trademark application. See id. GCCA owns U.S. Trademark Registration No. 4,583,405 for the TAVERNA KYCLADES word and design marks for use in connection with restaurant services. The registration is valid, subsisting, and incontestable. Pl.'s Tr. Exs. 2, 3; Trial Tr. 209.

20. Once the TAVERNA KYCLADES restaurant was sold to Ardian Corporation, the restaurant began receiving favorable publicity. Mr. Skenderi was featured in published articles, and on various American television shows as well as on a foreign television show. Trial Tr. 190-91.

21. The Astoria location of TAVERNA KYCLADES has been the subject of favorable reviews in the renowned Michelin Guide to

restaurants. The restaurant was also reviewed in Japan's version of <u>Zagat</u>. <u>Id.</u> 191.

22. After the purchase of the restaurant, the Astoria location increased in popularity, developing worldwide renown and drawing customers from throughout the United States and other countries. <u>Id.</u> 92-93, 187, 191.

23. In March 2013, at Mr. Skenderi's request, the Pappas family -- through John Pappas -- loaned Mr. Skenderi $800,000 to buy a property at 20th Avenue in Astoria to which Mr. Skenderi intended to relocate the Astoria TAVERNA KYCLADES restaurant. <u>Id.</u> 68-69, 224-25, 243-45, 274-75.

24. Mr. Skenderi used the $800,000 to purchase the property on 20th Avenue, but the Skenderis did not end up building a restaurant there. They realized it would take significantly more money to do so, which they did not have. <u>Id.</u> 224-25, 244.

25. In approximately late 2012 or early 2013, Louis Pappas and his two sons Paul and John Pappas, Mr. Pappas' brothers, began to engage in conversations with Mr. Skenderi about the possibility of a joint undertaking between the Pappas family and Mr. Skenderi to open a Manhattan TAVERNA KYCLADES location. <u>Id.</u> 191-92. As outlined by Louis Pappas, the restaurant would have the Taverna Kyclades name. If the joint undertaking did not work out for the parties, Mr. Skenderi could take back use of the Taverna Kyclades name and walk away

8

from the restaurant. Id. 71-72, 74. There was never a discussion between any member of the Pappas family and Mr. Skenderi about transferring ownership of the Taverna Kyclades name to the Pappas family. Id. 74-75.

26. Discussions regarding the possible terms of a restaurant venture including the split of the profits evolved over time and continued until a final agreement was reached around February 2013, before MACCG was incorporated on April 15, 2013. Id. 75-77, 192-93, 197-98, 248-49.

27. In the parties' final oral agreement, John and Paul Pappas, on behalf of the Pappas family, agreed with Mr. Skenderi to open a TAVERNA KYCLADES restaurant at 228 First Avenue in the East Village neighborhood in Manhattan, with the ownership of the restaurant, and the profits, to be split 50/50 between Mr. Skenderi and Mr. Pappas. Following the terms in the initial discussions, if the relationship did not work out or the restaurant was not successful, the Taverna Kyclades name would be removed, the Pappas family could operate the restaurant under a different name and Mr. Skenderi would walk away from the business. Id. 76, 83. There was no credible testimony that Mr. Skenderi contributed the TAVERNA KYCLADES marks to MACCG. MACCG was unable to point to any discussion where such an agreement was reached, and there was no document showing such an agreement. It is plain that MACCG would operate the East

Village restaurant using the name TAVERNA KYCLADES, but no such understanding interfered with Mr. Skenderi's ability to withdraw the use of that name. In addition, Mr. Pappas and Mr. Skenderi have always been, and are currently, managers of MACCG with full authority to act on behalf of and bind MACCG. Id. 17-22, 65-66, 118-19, 241; see NY LLCL § 412(a). Mr. Pappas, however, functions and has always functioned as a silent partner of MACCG; he has delegated his authority to his brothers John and Paul Pappas. Trial Tr. 19-20, 30-31, 235-38.

28. The oral agreement provided for a 50/50 share of the profits and losses of the East Village restaurant between Mr. Skenderi and Mr. Pappas. After the agreement was reached regarding the East Village restaurant, William Pappas was told he would be a 50/50 partner of MACCG. Id. 20-21.

29. Mr. Skenderi advised Mrs. Skenderi about the terms of the agreement, including the 50/50 split of the profits and his ability to terminate permission for the use of the TAVERNA KYCLADES name if the relationship did not work out. Id. 193.

30. At the time the agreement was reached, the TAVERNA KYCLADES marks were owned by Ardian Corporation, and Mrs. Skenderi was the sole owner of Ardian Corporation. She would not have agreed to transfer ownership of the TAVERNA KYCLADES marks to MACCG. Id. 205-06, 216.

31. Mr. Skenderi was only interested in opening the one East
    Village restaurant with the Pappas family. Id. 73-74, 84-85.
    The Pappas family was instead interested in franchising the
    TAVERNA KYCLADES marks and opening restaurants under the
    TAVERNA KYCLADES name in multiple locations. Id. 247, 253.

32. At the time Mr. Skenderi agreed to the use of the TAVERNA
    KYCLADES marks in connection with the Greek restaurant to be
    opened in the East Village, the TAVERNA KYCLADES marks and
    associated goodwill were very valuable. Id. 116-17.

33. There was no discussion of any participation by the Pappas
    family or the joint operation that became MACCG in profits
    generated by the Astoria TAVERNA KYCLADES restaurant; the
    parties understood that the TAVERNA KYCLADES Astoria
    restaurant would continue to operate as it had since 2001
    under the ownership of a Skenderi entity. Id. 97, 254.

34. The grand opening of the TAVERNA KYCLADES East Village
    restaurant occurred on October 8, 2013. Id. 86, 193.

35. Although MACCG was operating the TAVERNA KYCLADES location in
    the East Village, including customer dining, by the autumn of
    2013, the Skenderi and Pappas interests never executed a
    formal contract, or even exchanged a term sheet, setting forth
    the terms of a business relationship. Id. 76-77.

36. No operating agreement was ever created for the MACCG limited
    liability company. Id. 76-77, 241.

37. No document was ever executed assigning or licensing any rights to the TAVERNA KYCLADES marks to MACCG, nor was there ever a discussion about whether a trademark application had been or would be filed to register the TAVERNA KYCLADES marks. Id. 254-56.

38. The East Village TAVERNA KYCLADES restaurant space was in a building owned by PDJ Realty, a Pappas-affiliated entity, but the Pappas family did not contribute that space to the MACCG venture. PDJ Realty is owned by the Pappas siblings, Paul, John, and Debbie Pappas. MACCG paid monthly rent to PDJ Realty, the Pappas landlord entity, throughout Mr. Skenderi's association with the restaurant, and continues to do so to date. Id. 23-24, 87-88, 258-59. PDJ Realty has charged MACCG rent significantly lower than the market-rate rent. Id. 257-59.

39. Prior to the installation of the TAVERNA KYCLADES restaurant at 228 First Avenue in the East Village, the Pappas family owned and operated a Mexican restaurant, Tepito Taqueria and Cantina, in the space. The Tepito Taqueria and Cantina was unsuccessful, and the Pappas family closed the restaurant. Id. 70-71, 79.

40. Tepito Taqueria and Cantina was installed in a space that previously housed David's Bagels. Using their own construction company, the Pappas family gutted the David's Bagels space

before converting the space to Tepito Taqueria and Cantina in 2010. Louis and John Pappas each estimated the cost of that construction to be $1 million using an estimated cost per square foot. Id. 85, 245-46, 258, 275, 310-13.

41. In contrast, the construction necessary to design and construct a Greek restaurant in the Tepito Taqueria and Cantina space was "cosmetic." Id. 275. Again, using their own construction company, the Pappas family converted the Tepito Taqueria and Cantina restaurant space at 228 First Avenue from a Mexican restaurant to a Greek restaurant. Mr. Skenderi designed the space to look similar to the design of the TAVERNA KYCLADES Astoria restaurant. Id. 79-81, 161.

42. The Pappas family told Mr. Skenderi that the cost for the conversion of the space to a Greek restaurant by the Pappas construction company was $150,000. This amount was reimbursed to the Pappas family out of the East Village restaurant's proceeds during the first months it was opened. Id. 82-83, 199, 221-22.

43. MACCG contends that the Pappas family contributed to MACCG a fully built-out restaurant that was built at a cost of over $1 million together with renovations in the amount of roughly $150,000 to turn the restaurant into the TAVERNA KYCLADES restaurant. But the original restaurant was unsuccessful and the $150,000 was reimbursed to the Pappas family after the

TAVERNA KYCLADES restaurant opened. There is no documentation that any of the installations for the original Mexican restaurant were in fact contributed to MACCG rather than simply used by MACCG, and the space was owned by PDJ Realty, the Pappas family entity.

44. Neither MACCG nor any member of the Pappas family decided to apply to register the TAVERNA KYCLADES Trademarks.

45. In 2018, the Skenderis opened a TAVERNA KYCLADES restaurant in Bayside, Queens. Prior to opening the restaurant, Mr. Skenderi had told John Pappas that Mr. Skenderi intended to open another Taverna Kyclades restaurant. Like the TAVERNA KYCLADES Astoria restaurant, the Bayside restaurant was owned and operated by the Skenderis, and neither the Pappas family nor MACCG had any involvement in the operation or ownership of the TAVERNA KYCLADES Bayside restaurant. Id. 97-100, 209.

46. After the Pappas family learned that the Skenderis would be owning and operating another TAVERNA KYCLADES restaurant in Bayside, Queens, at no time did Mr. Pappas or any other representative of MACCG protest the opening or seek profits from the Bayside restaurant. Id. 98. Nor did they question Mr. Skenderi about the registration or ownership of the TAVERNA KYCLADES trademark or do anything else to determine what rights MACCG had in the TAVERNA KYCLADES marks. Id. 286-89.

14

47. From 2013 to the first week in January 2020, Mr. Skenderi had been monitoring the quality of the restaurant services at the East Village restaurant. He regularly visited the East Village restaurant to act as the executive or head chef, exercising quality control over the food and services, selecting the menu, overseeing the operation of the kitchen, and procuring the fresh fish to be served at the restaurant. Id. 87, 252-63, 304, 307-08. In addition to his 50 percent share of the profits, Mr. Skenderi was compensated for his work at the East Village restaurant. Mr. Skenderi also continued to supervise the Astoria TAVERNA KYCLADES restaurant and, beginning in 2018, the Bayside TAVERNA KYCLADES restaurant. Id. 172-74.

48. At no time did Mr. Pappas or any other representative of MACCG protest the continued and exclusive use by GCCA and the Skenderis of the TAVERNA KYCLADES marks for restaurant services at the original Astoria location. At no time did MACCG or any Pappas representative participate in the operations of, or draw any revenue from, the operations at the Astoria or Bayside TAVERNA KYCLADES restaurants, which were the exclusive domain of GCCA and the Skenderis. Id. 96-98.

49. At no time from 2013 until 2021, when this lawsuit was filed by GCCA, did Mr. Pappas or any MACCG representative assert that MACCG owned the TAVERNA KYCLADES marks, id. 111-12, seek to cancel GCCA's TAVERNA KYCLADES trademark registration, or

15

take any other action to prevent the Skenderis' use of the TAVERNA KYCLADES Trademarks. Id. 289.

50. During the September 2013 to mid-2019 time period, consistent with his rights as a 50 percent owner and manager of MACCG, Mr. Skenderi exercised his ability to control the quality of the East Village restaurant food and services, and the hiring and firing of employees. Id. 86, 102-03, 139-40, 173, 219, 253-54, 262-63; 267.

51. During this same six-year period, as a 50 percent member of MACCG, Mr. Skenderi received annual distributions, based on the TAVERNA KYCLADES East Village restaurant's performance and profitability. Id. 120-27, 263.

52. Specifically, Mr. Skenderi received over one million dollars in distributions over this six-year period, as reflected in his yearly Schedule K-1 (Form 1065) or Partner's Share of Income form, and he also bore 50 percent of the losses to the extent there were any. Id. 120-28, 263.

53. In addition, during this six-year period, Mr. Skenderi received a separate salary totaling hundreds-of-thousands of dollars for physical labor he actually performed at the East Village restaurant, as reflected in his W-2 forms. Id. 120-21, 133-39, 264.

54. At no point did MACCG pay GCCA, Mr. Skenderi, or Mrs. Skenderi any royalties or any licensing fees for MACCG's use

of the TAVERNA KYCLADES Trademarks in connection with the East Village restaurant. ECF No. 151 ¶¶ 49, 51; Trial Tr. 76-77, 254.

55. Over time, Mr. Skenderi's ability to control the quality of the food and services at the East Village restaurant was obstructed by John and Paul Pappas and employees reporting to them, who got involved in making decisions negatively affecting the quality of the food and services at the restaurant. Trial Tr. 174-75.

56. In or about late 2019, Mr. Skenderi grew increasingly dissatisfied with the quality of restaurant goods and services being offered to the consuming public at the East Village TAVERNA KYCLADES location and communicated those concerns to John and Paul Pappas. Mr. Skenderi tried multiple times to address the issue and to correct the quality of the food and services, but his complaints were ignored. His ability to control the quality of the restaurant services was obstructed. Id. 101-04, 213-14.

57. In one visit to the East Village restaurant, Mr. Skenderi found fish in the restaurant's freezer that was inedible. When Mr. Skenderi raised the issue, John Pappas dismissed Mr. Skenderi's concerns as unfounded. Id. 111, 115-16.

58. In December 2019, Mr. Skenderi arranged a meeting with John and Paul Pappas regarding the need to fire the chef and

17

improve the quality of the food at the restaurant. Mr. Skenderi told them that he needed to retake control of the operations or he would take back the TAVERNA KYCLADES Trademarks and remove himself from the East Village restaurant business. Id. 106-07.

59. John and Paul Pappas told Mr. Skenderi they needed two weeks to discuss what he told them. Id. 107. Neither John nor Paul Pappas protested that the TAVERNA KYCLADES Trademarks were not owned by MACCG. Id. 112.

60. At the end of the two weeks, neither John nor Paul Pappas called Mr. Skenderi, and they did not answer nor return Mr. Skenderi's calls. Mr. Skenderi went to the East Village restaurant to get the Pappas brothers' response, and to reiterate that things could not continue the way they were. Paul Pappas said that he had been too busy to respond and that he was leaving for Florida. Id. 107-08.

61. On January 2, 2020, Mr. Skenderi went to the East Village restaurant and fired the chef. The following day, January 3, 2020, Mr. Skenderi returned to the restaurant, ready to take over. He met John Pappas, who informed Mr. Skenderi that Mr. Skenderi could not fire the chef, who was still there, and that a Pappas cousin would be running the restaurant. Mr. Skenderi replied that the latter was not qualified to run the restaurant. Id. 108-09, 316.

62. When Mr. Skenderi said that he should be able to fire the chef because the restaurant was using his name, John Pappas said "no, this is our [the Pappas'] restaurant." Id. 109. Mr. Skenderi responded that, if the Pappas brothers were going to keep these employees, Mr. Skenderi would remove his name from the restaurant. John Pappas said Mr. Skenderi could not do so because it was their (the Pappas') restaurant. In the exchange on January 3, 2020, John Pappas did not say that Mr. Skenderi could not do so because MACCG or the Pappas family owned the name. At that point, Mr. Skenderi walked out and never returned to the East Village restaurant. Id. 109-12. Mr. Skenderi continues as a 50 percent owner of MACCG, and continues to receive K-1s and shares in the profits and losses of MACCG. Id. 120-21, 125-33. MACCG has operated at a loss for the years 2021 and 2022. Id. 129-33. But, Mr. Skenderi has testified that his other TAVERNA KYCLADES restaurant locations, Astoria and Bayside, have been doing well and have been profitable. Id. 117, 128-29.

63. On January 30, 2020 (in a letter erroneously misdated January 30, 2019), see id. 270, and again on March 6, 2020, GCCA sent cease and desist letters to MACCG, demanding that the company immediately stop all use of the TAVERNA KYCLADES marks. MACCG continued its use of the marks, after receipt of these demands up to the present time. Id. 215, 271.

19

64. In the exchange of correspondence between counsel for the parties preceding this litigation, MACCG's attorneys did not mention any purported "assignment" of the trademarks by GCCA (or a predecessor) to MACCG. In a February 10, 2020 response to GCCA's original demand, counsel for the defendant claimed that MACCG had "implied consent" to use the trademarks. Pl's Tr. Ex. 9. Correspondence from a different lawyer for MACCG on June 5, 2021, asserted an "implied (and irrevocable) license" to use the marks in connection with the East Village location. Pl's Tr. Ex. 13. Neither letter asserted, or even suggested, an ownership of the trademarks on the part of MACCG, by assignment or otherwise. The first such assertion appeared in MACCG's answer to the Complaint in this action, more than 1.5 years after MACCG received the first cease and desist letter.

65. John Pappas reviewed the cease and desist correspondence between his counsel and counsel for GCCA and discussed the correspondence with his counsel. Trial Tr. 292-93.

66. The East Village restaurant's website continues to prominently feature the TAVERNA KYCLADES marks and includes features that are identical to those included in the website for the TAVERNA KYCLADES Astoria and Bayside restaurants. Pl's Tr. Ex. 25; Trial Tr. 210-11.

67. Because the TAVERNA KYCLADES East Village restaurant uses the same TAVERNA KYCLADES name and logo as the Astoria and Bayside

restaurants, consumers have been and continue to be confused about the relationship or association between the Astoria and Bayside restaurants and the East Village restaurant. Id. 151-52. Complaints about the quality and quantity of the food and the quality of the service at the East Village restaurant damage the reputation of the Astoria and Bayside restaurants.

## CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction over all claims and counterclaims pursuant to 28 U.S.C. §§ 1331, 1338 with respect to all claims arising under Title 15 of the United States Code, the Lanham Act, 15 U.S.C. 1051 et seq., as well as related state claims pursuant to supplemental jurisdiction, 28 U.S.C. § 1367.

### TRADEMARK INFRINGEMENT IN VIOLATION OF 15 U.S.C. § 1114

2. Section 32(1) of the Lanham Act provides protection against the use in commerce of a "reproduction, counterfeit, copy, or colorable imitation of a registered mark" where "such use is likely to cause confusion, or to cause mistake, or to deceive[.]" 15 U.S.C. § 1114(1).[2]

---

[2] Unless otherwise noted, this Memorandum Opinion and Order omits all alterations, citations, footnotes, and internal quotation marks in quoted text.

3. To establish a trademark infringement claim under 15 U.S.C. § 1114, a plaintiff must show that it has a valid registered mark that is entitled to protection and that the defendant's actions are likely to cause confusion with the plaintiff's mark. See Morningside Grp., Ltd. v. Morningside Cap. Grp., LLC., 182 F.3d 133, 137 (2d Cir. 1999); Estee Lauder, Inc. v. The Gap, Inc., 108 F.3d 1503, 1508 (2d Cir. 1997); Brockmeyer v. Hearst Corp., 248 F. Supp. 2d 281, 292 (S.D.N.Y. 2003).

4. GCCA is the owner of the TAVERNA KYCLADES Trademarks, U.S. Trademark Registration No. 4,583,405, for use in connection with restaurant services. Because the registered marks have been registered on the principal register and GCCA has used the marks for more than five consecutive years after that registrations, see 15 U.S.C. § 1065, the registered marks are incontestable, and incontestable registration is proof of the marks' validity, GCCA's ownership, and GCCA's exclusive right to use the registered marks with the services specified in the trademark registration. See 15 U.S.C. § 1115.

5. Because the registration is incontestable, absent proof of fraud in the registration, the defendant cannot contest any of the facts relevant to the validity of the TAVERNA KYCLADES Trademarks registration, including the date of first use, use

in commerce, or ownership of the trademarks. <u>See</u> <u>Park 'N Fly,</u>
<u>Inc. v. Dollar Park & Fly, Inc.</u>, 469 U.S. 189, 194-95 (1985).[3]

6. The filing of a United States trademark application and the
   prosecution of the trademark application are publicly
   available on the USPTO website. Registration of the TAVERNA
   KYCLADES Trademarks provides all members of the public,
   including MACCG and the Pappas family, with constructive
   notice of the trademark application and registration. <u>See</u> <u>id.</u>
   at 200; 15 U.S.C. § 1072; <u>In re Int'l Flavors & Fragrances,</u>
   <u>Inc.</u>, 183 F.3d 1361, 1366-67 (Fed. Cir. 1999).

7. Prior to the registration of the TAVERNA KYCLADES Trademarks,
   Ardian Corporation held common law rights in the TAVERNA
   KYCLADES word mark in connection with restaurant services
   based on its ownership and continuous use of the mark since
   2001, until it assigned those rights to GCCA. <u>See</u> <u>In re Int'l</u>
   <u>Flavors & Fragrances, Inc.</u>, 183 F.3d at 1366-67.

---

[3] MACCG argues that GCCA obtained the Trademark registration by
fraud, and that GCCA knowingly misrepresented that it was the
owner of the marks when it knew it had "assigned" the marks to
MACCG. But, for the reasons discussed herein, there is no
credible evidence that GCCA had assigned the marks to MACCG.
Indeed, the fact that GCCA openly applied for the registration
of the marks in 2013, obtained that public registration in 2014,
and continued to use the marks for many years thereafter without
any complaint or protest by MACCG shows that it did not assign
those marks to MACCG.

8. GCCA is a limited liability company. Limited liability companies are separate legal entities from their members. Battino v. Cornelia Fifth Ave., LLC, 861 F. Supp. 2d 392, 408 (S.D.N.Y. 2012) ("It is black letter law that a limited liability company exists as a separate entity from its members."). The TAVERNA KYCLADES Trademarks registration is owned by GCCA, not by Mr. Skenderi individually.

9. The TAVERNA KYCLADES Trademarks are plainly entitled to protection under the Lanham Act; thus, "the central question is whether the defendant's entrance into the marketplace and its use of its mark will generate a likelihood of confusion among an appreciable number of ordinarily prudent purchasers." See Henegan Constr. Co., Inc. v. Heneghan Contracting Corp., 2002 WL 1300252, at *5 (S.D.N.Y. June 12, 2002). MACCG argues that there can be no confusion between the use of the TAVERNA KYCLADES marks by MACCG and their use by GCCA, the registered owner of the marks, because Mr. Skenderi is a 50 percent owner of both LLC's. The argument is frivolous: GCCA is a distinct corporate entity from MACCG, and while Mr. Skenderi is a 50 percent owner of both LLC's, Mrs. Skenderi is also a 50 percent owner of GCCA. Moreover, Mr. Skenderi shared control of MACCG with Pappas family members and indeed disagreements between Mr. Skenderi and Pappas family members led to the current dispute. GCCA had the right to assert its rights to

24

the TAVERNA KYCLADES marks that it owns and to prevent the use of the marks by the East Village restaurant, which is likely to cause confusion with the authorized use of the marks by the Astoria and Bayside restaurants owned by GCCA.

10. None of the cases cited by MACCG are to the contrary, nor do they involve disputes between two, distinct corporate entities. See ECF No. 151 ¶¶ 122-32 (citing Circle Line Sightseeing Yachts, Inc. v. Circle Line-Statue of Liberty Ferry, Inc., 195 F. Supp. 2d 547, 549-51 (S.D.N.Y. 2002) (finding that a corporation failed to establish that it holds exclusive rights to a trademark when "complete overlap of ownership between the two corporations" obviated the need for each corporation to "define the rights each held in the mark[.]"); In re Wella A.G., 787 F.2d 1549, 1552 (Fed. Cir. 1986) (concluding that the USPTO Trial and Appeal Board erred in denying registration of a trademark to a corporate entity when, "there will be no confusion in the marketplace, because, as far as the consuming public is concerned, there is only one [corporate entity]."); Derminer v. Kramer, 406 F. Supp. 2d 756, 758-59 (E.D. Mich. 2005)(finding that a federal court lacked subject matter jurisdiction over trademark dilution claim brought by one non-corporation owner of the trademark against another non-corporation owner of the trademark); Piccari v. GTLO Prods., LLC, 115 F. Supp. 3d 509, 513-16 (E.D.

Pa. 2015) (finding that former members of a band and co-owners of a trademark were barred from stating a trademark infringement claim against co-owners of the trademark who had "equal and unfettered rights of use" when both USPTO records reflect co-ownership of the trademark); Lightfoot v. DeBruine, No. cv-20-00666, 2023 WL 2665732, at *6-7 (D. Ariz. Mar. 28, 2023)(finding that trademark dispute among sisters, who are joint shareholders of a musical group, could not be maintained against individual co-owners); Silverstar Enters., Inc. v. Aday, 537 F. Supp. 236, 239-41 (S.D.N.Y. 1982)(dismissing a trademark infringement claim brought by a plaintiff, who lacked proprietary rights in the trademark, and who entered into a license agreement to use the defendant's registered trademark).

11. By contrast, pursuant to 15 U.S.C. § 1055, courts in this Circuit have found that related companies, often licensors, can allege Lanham Act violations against related companies, often licensees. See, e.g., Franchised Stores of N.Y., Inc. v. Winter, 394 F.2d 664, 669 (2d Cir. 1968) ("We . . . hold that, assuming all the requisite elements of infringement are established, a trademark licensor may succeed in a trademark

infringement action against one who is still his licensee.").[4]
To determine if there is a likelihood of consumer confusion,
courts in the Second Circuit look at the eight <u>Polaroid</u>
factors, <u>Polaroid Corp. v. Polarad Elecs. Corp.</u>, 287 F.2d 492,
495 (2d Cir. 1961), none of which is dispositive. <u>See</u>
<u>Brennan's Inc. v. Brennan's Rest., LLC.</u>, 360 F.3d 125, 130 (2d
Cir. 2004). The <u>Polaroid</u> factors are (1) the strength of the
mark; (2) the similarity of the marks; (3) the proximity of
the products and their competitiveness with one another; (4)
evidence that the senior user may bridge the gap by developing
the product for sale in the market of the alleged infringer's
product; (5) evidence of actual consumer confusion; (6)
evidence that the imitative mark was adopted in bad faith; (7)
the respective quality of the products; and (8) the
sophistication of consumers in the relevant market. <u>See</u>
<u>Polaroid Corp.,</u> 287 F.2d at 495. Analysis of the relevant
factors in the context of this Lanham Act violation supports

---

[4] Section 5 of the Lanham Act, 15 U.S.C. § 1055 provides:

> Where a registered mark or a mark sought to be registered
> is or may be used legitimately by related companies, such
> use shall inure to the benefit of the registrant or
> applicant for registration, and such use shall not affect
> the validity of such mark or of its registration, provided
> such mark is not used in such manner as to deceive the
> public.

the conclusion that GCCA has established a likelihood of
confusion by MACCG. See <u>Car-Freshner Corp. v. Am. Covers</u>, LLC,
980 F.3d 314, 329 (2d Cir. 2020)

12. With respect to the first <u>Polaroid</u> factor, the strength of
the mark is analyzed based on "its tendency to identify the
goods or services sold under the mark as emanating from a
particular, although possibly anonymous, source." <u>Sports
Auth., Inc. v. Prime Hosp. Corp.</u>, 89 F.3d 955, 960-61 (2d Cir.
1996). "The strength of a trademark in the marketplace and the
degree of protection to which it is entitled are analyzed
under four categories of marks that indicate increasing
distinctiveness and protectability: (1) generic; (2)
descriptive; (3) suggestive; (4) arbitrary or fanciful."
<u>Gameologist Grp., LLC v. Sci. Games Int'l, Inc.</u>, 838 F. Supp.
2d 141, 154 (S.D.N.Y. 2011), <u>aff'd,</u> 508 F. App'x 31 (2d Cir.
2013). "Generic marks are not entitled to protection under the
Lanham Act, while arbitrary marks will almost always be seen
as strong marks." <u>Sports Auth.</u>, 89 F.3d at 961. Descriptive
and suggestive marks are strong if they have secondary
meaning. The secondary meaning of a descriptive mark is
incontestable if the mark is registered and in continuous use
for at least five consecutive years. <u>Gruner + Jahr USA Publ'g,
a Div. of Gruner + Jahr Printing and Publ'g Co. v. Meredith
Corp.</u>, 991 F.2d 1072, 1076-77 (2d Cir. 1993); <u>see also id.</u> at

28

961 (affirming the district court's finding that "such secondary meaning had been acquired through the mark's uncontested use for five years."). Here, the mark is descriptive or suggestive -- a Greek seafood tavern -- and has been registered and in continuous use for more than five years. Accordingly, GCCA's marks acquired secondary meaning through their use in connection with the Taverna Kyclades restaurant long before the defendant's unauthorized use, and are incontestable and strong marks. See The Marks Org., Inc. v. Joles, 784 F. Supp. 2d 322, 329 (S.D.N.Y. 2011).

13. Regarding the second Polaroid factor – the similarity of the marks - the defendant uses the identical TAVERNA KYCLADES marks for the same services in the same channels of trade. "This degree of similarity, furthermore, is in the context of an unusual and distinctive design. The more unusual and distinctive the design of a trademark logo, the greater the likelihood that such an astonishing degree of similarity will evoke an assumption that the senior and junior user are affiliated." Guthrie Healthcare Sys. v. ContextMedia, Inc., 826 F.3d 27, 38 (2d Cir. 2016). There is no dispute in this case that the marks are identical.

14. The third Polaroid factor is the proximity of services. See Citigroup, Inc. v. City Holding Co., 171 F. Supp. 2d 333, 348

(S.D.N.Y. 2001). In this case, there is no gap -- the services are identical.

15. The fourth Polaroid factor – evidence that the senior user is likely to enter the junior user's market – is likely "when, as here, the parties are already in the same business." Citigroup Inc., 171 F. Supp. 2d at 348; see also Nikon, Inc. v. Ikon Corp., 987 F.2d 91, 95 (2d Cir. 1993) (noting that the district court was "correct in finding that, if there already is an overlap in the market, the likelihood of confusion is greater.").

16. Regarding the fifth Polaroid factor, "no actual consumer confusion need be shown to justify a finding of a likelihood of confusion, although the presence of actual confusion obviously supports such a finding." Les Ballets Trockadero de Monte Carlo, Inc. v. Trevino, 945 F. Supp. 563, 571 (S.D.N.Y. 1996). Mr. Skenderi testified that customers called the Astoria TAVERNA KYCLADES location and complained about the smaller portions, higher prices, and worse quality of the food at the East Village location compared to the Astoria location. See Trial Tr. 154. Mrs. Skenderi also testified that she was confused between the websites for the East Village location and the Astoria location, because the TAVERNA KYCLADES marks on the East Village website were the same as that for the Astoria location. See id. 210-11.

17. The sixth <u>Polaroid</u> factor is the defendant's relative good
    faith in adopting its imitative mark. <u>See</u> <u>Nikon, Inc.</u>, 987
    F.2d at 96. While not adopted in bad faith, the defendant's
    continued use of the TAVERNA KYCLADES marks long after its
    permission to use the marks terminated demonstrates the
    defendant's bad faith. <u>See</u> <u>id.</u> The defendant's continued use
    of the TAVERNA KYCLADES Trademarks deceptively implies that
    the East Village restaurant's use is authorized by GCCA, and
    that the East Village restaurant services are subject to the
    same quality control as the Astoria and Bayside restaurants.
    <u>See</u> <u>Frank Brunckhorst Co. v. G. Heileman Brewing Co.</u>, 875 F.
    Supp. 966, 982 (E.D.N.Y. 1994) ("When a company appropriates a
    mark that is well-known and has acquired a secondary meaning,
    an inference can be drawn that the company intends to
    capitalize on the good will and reputation of the mark, as
    well as any confusion that might result as to the common
    origin between that mark and the senior user's product."). The
    defendant's continued use of the marks after its authorization
    to use the marks was terminated by GCCA constitutes willful
    and intentional infringement of GCCA's trademark rights
    because the defendant has at all relevant times had knowledge
    that its activities are in direct contravention of GCCA's
    rights. <u>4 Pillar Dynasty LLC v. New York & Co., Inc.</u>, 933 F.3d
    202, 209-10 (2d Cir. 2019) (to "support a finding of

willfulness in a Lanham Act case . . . a plaintiff must show
(1) that the defendant was actually aware of the infringing
activity, or (2) that the defendant's actions were the result
of reckless disregard or willful blindness."). The defendant
has willfully infringed GCCA's registered marks by offering
and providing services that are identical or nearly identical
to the restaurant services offered and provided by GCCA's
licensees, under or in connection with the TAVERNA KYCLADES
marks, or a colorable imitation thereof, in interstate
commerce, without the permission of GCCA, and in a manner that
was likely to and in fact has caused confusion, mistake, and
deception. <u>See</u> <u>Innovation Ventures, LLC v. Ultimate One</u>
<u>Distrib. Corp.</u>, 176 F. Supp. 3d 137, 164-65 (E.D.N.Y. 2016).

18. The final two <u>Polaroid</u> factors – the quality of the junior
user's marks and the buyers' sophistication – do not mitigate
the likelihood of confusion. The quality of the restaurant
services at the East Village restaurant appears to have
declined, and Mr. Skenderi has not supervised the quality of
the service for some time. Because "the products are identical
and the marks are identical, the sophistication of buyers
cannot be relied on to prevent confusion." <u>Banff, Ltd. v.</u>
<u>Federated Dept. Stores, Inc.</u>, 841 F.2d 486, 492 (2d Cir.
1988); <u>see also</u> <u>Hasbro, Inc. v. Lanard Toys, Ltd.</u>, 858 F.2d
70, 78 (2d Cir. 1988) ("Another view is that a junior user's

product of equal quality to a senior user's product injures
the senior user by the increased tendency of similar quality
products to promote consumer confusion.").

19. For the reasons discussed above, the <u>Polaroid</u> factors support
the plaintiff's case. Given that the plaintiff has valid and
protectible marks, and considering these <u>Polaroid</u> factors as a
whole, the plaintiff has established its claims for trademark
infringement under the Lanham Act.

20. The defendant's infringing activities have caused, and absent
injunction will continue to cause, irreparable harm to GCCA
and its business, reputation, and the goodwill of its marks.

<u>UNFAIR COMPETITION IN VIOLATION OF 15 U.S.C. § 1125(a)</u>

21. Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a),
proscribes false representations including misrepresentations
as to the source or sponsorship of goods or services. <u>Sutton
Cosms. (P.R.), Inc. v. Lander Co.</u>, 455 F.2d 285, 287 (2d Cir.
1972).

22. To state a claim of unfair competition under the Lanham Act,
the plaintiff must allege that the defendant: "(1) made false
representations, (2) for goods, (3) in interstate commerce,
(4) in commercial advertising or promotion, (5) about a
material facet of [the plaintiff's] product, (6) that caused

damage to [the plaintiff]." Spotless Enters., Inc. v. Carlisle
Plastics, Inc., 56 F. Supp. 2d 274, 277 (E.D.N.Y. 1999).

23. Long prior to the defendant's unauthorized use of the TAVERNA
KYCLADES marks, GCCA (and its predecessor in interest offering
restaurant services under the marks) extensively used the
marks in interstate commerce to identify their services and to
distinguish them from the services provided by others. See
Trial Tr. 96. That longstanding use and the resulting fame of
the marks have indicated and do indicate to consumers and the
industry that restaurant services offered under and in
connection with the marks are distributed by, originate from,
and are provided by GCCA and its licensees.

24. The defendant's continuing use of the marks after proper
demand that it cease and desist constitutes proof of an
express intent to cause confusion and mistake, to deceive and
mislead the consumers, to trade upon the reputation of GCCA,
and to improperly appropriate GCCA's valuable trademark
rights. See Mun. Credit Union v. Queens Auto Mall, Inc., 126
F. Supp. 3d 290, 295 (E.D.N.Y. 2015).

25. The defendant's use of the marks has created the likelihood
of deceiving consumers as to the origin, source, sponsorship,
and affiliation of the defendant and its services, and has
caused consumers to believe, contrary to fact, that the
defendant's services are sold, authorized, endorsed, or

34

sponsored by GCCA, or that the defendant is in some way affiliated with or sponsored by GCCA or, in the alternative, that GCCA's own services are sold, authorized, endorsed, or sponsored by the defendant.

26. The defendant's unauthorized use constitutes a use in interstate commerce of a false designation of origin and a false and misleading description and representation in commerce, with knowledge of the falsity, and is likely to cause confusion, mistake, and deception, constituting a false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). See S.C. Johnson & Sons, Inc. v. Clorox Co., 241 F.3d 232, 238 (2d Cir. 2001).

27. The defendant's use of the marks has caused, and absent injunction will continue to cause, irreparable harm to GCCA and its business, reputation, and goodwill.

## DILUTION IN VIOLATION OF 15 U.S.C. § 1125(c)

28. Under the Federal Trademark Dilution Act, a plaintiff must show (1) its mark is famous; (2) the defendant is making commercial use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish goods and services. 15 U.S.C. § 1125(c); see

Heller, Inc. v. Design within Reach, Inc., 2009 WL 2486054, at
*3 (S.D.N.Y. Aug 14, 2009).

29. A famous mark requires a high level of recognition. There is
minimal episodic information about the well-known nature of
the marks, but that evidence is insufficient to establish that
the marks are famous. "Fame" is the "key ingredient" to any
dilution claim, see Fiber-Shield Indus. Inc. v. Fabricshield
Holdings, LLC, 2023 WL 2734731, at *6 (E.D.N.Y. Mar. 31,
2023), and the Lanham Act makes clear that a mark qualifies as
famous only if "it is widely recognized by the general
consuming public of the United States as a designation of
source of the goods or services of the mark's owner," 15
U.S.C. § 1125(c)(2)(A). The statute's use of "the phrase
'widely recognized by the general consuming public of the
United States' 'was intended to reject dilution claims based
on niche fame, i.e. fame limited to a particular channel of
trade, segment of industry or service, or geographic region.'"
Luv N' Care, Ltd. v. Regent Baby Prods. Corp., 841 F. Supp. 2d
753, 757-58 (S.D.N.Y. 2012) (quoting Dan-Foam A/S v. Brand
Named Beds, LLC, 500 F. Supp. 2d 296, 307 n.90 (S.D.N.Y.
2007)). In this case, despite Mr. and Mrs. Skenderi's
anecdotal references to one-off customers and reviews, GCCA
has not introduced credible evidence -- empirical or otherwise
-- to show that recognition of the TAVERNA KYCLADES Trademarks

extends any further than the New York City region where all of
the TAVERNA KYCLADES restaurants are located. <u>See</u> Trial Tr.
271-72. TAVERNA KYCLADES is far from a household name. Because
GCCA has done absolutely nothing to show that the TAVERNA
KYCLADES Trademarks have any sort of "wide[ ] recogni[tion] by
the general consuming public of the United States," 15 U.S.C.
§ 1125(c)(2)(A), GCCA's dilution claim against MACCG fails.

<u>COMMON LAW UNFAIR COMPETITION VIOLATION</u>

30. In New York, common law unfair competition claims largely
    mirror the Lanham Act claims. <u>Lorillard Tobacco Co. v. Jamelis
    Grocery, Inc.,</u> 378 F. Supp. 2d 448, 456 (S.D.N.Y. 2005). To
    prevail on its claim of unfair competition under New York
    common law, GCCA must show the likelihood of confusion and
    that the defendant acted in bad faith. <u>Forschner Grp., Inc. v.
    Arrow Trading Co., Inc.,</u> 124 F.3d 402, 408 (2d Cir. 1997)
    ("[T]he essence of unfair competition is the bad faith
    misappropriation of the labors and expenditures of another,
    likely to cause confusion or deceive the purchasers as to the
    origin of the goods.").

31. The defendant's unauthorized use of the TAVERNA KYCLADES
    marks is identical to GCCA's use of the marks, and consumers
    are likely to attribute, and do in fact attribute, to the
    defendant the authorized use of the marks as a source, origin,

37

authorization, or sponsorship by GCCA, and therefore seek out the defendant's services based upon that mistaken belief.

32. By continuing to use the marks after its right to do so was terminated, the defendant intentionally appropriated the marks and the goodwill associated with them by using the marks with the intent of causing confusion, mistake, and deception as to the source, origin, relationship, sponsorship, or association of the defendant's services, constituting unfair competition under the common law.

## INJUNCTIVE RELIEF

33. GCCA does not seek damages, and requests only injunctive relief. See ECF No. 1, Compl. "To show that [the plaintiff] is entitled to any form of injunctive relief, [the plaintiff] must first satisfy the four requirements set forth by the Supreme Court in eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006)." Hermès Int'l v. Rothschild, No. 22-cv-384, 2023 WL 4145518, at *7 (S.D.N.Y. June 23, 2023). Accordingly, GCCA must show "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent

injunction." <u>eBay</u>, 547 U.S. at 391. "A plaintiff has no adequate remedy at law, if it can show that absent an injunction, the defendant is likely to continue infringing its trademarks." <u>Hermes Int'l</u>, F. Supp. 3d at 9.

34. The defendant's use of the marks has caused, and absent injunction will continue to cause, irreparable harm to GCCA and its business, reputation, and goodwill. GCCA has established that MACCG is infringing its registered marks and engaging in unfair competition under the Lanham Act and state law. And, after receiving GCCA's cease and desist letter, MACCG continued its use of the marks. <u>See</u> Tr. 215-16. GCCA has also established that it has suffered and will suffer irreparable harm without an injunction. Consumers will confuse the restaurant services provided at the East Village restaurant with those provided at the authorized Astoria and Bayside restaurants. Given the quality problems with the East Village restaurant, this will result in irreparable injury to GCCA. The balance of hardships and the public interest support the issuance of an injunction. MACCG has no right to use the registered marks that belong to GCCA, and MACCG's continued use of those marks harms the rightful owners of the marks. <u>See</u> <u>Museum of Mod. Art v. MOMACHA IP LLC</u>, 339 F. Supp. 3d 361, 382 (S.D.N.Y. 2018); <u>Mun. Credit Union</u>, 126 F. Supp. 3d at 299; <u>Virgin Enters., Ltd. v. Enom, Inc.</u>, 2008 WL 4054418, at *2-3

(S.D.N.Y. Aug. 18, 2008); <u>Toys "R" Us, Inc., v. Abir</u>, 1997 WL

857229, at *3-4 (S.D.N.Y. Dec. 19, 1997); <u>Russian Kurier,</u>

<u>Inc., v. Russian Am. Kurier, Inc.</u>, 899 F. Supp. 1204, 1212-13

(S.D.N.Y. 1995).

<u>MACCG'S AFFIRMATIVE DEFENSES</u>

35. Although the Lanham Act requires assignments of a registered

trademark to be in writing, <u>see</u> 15 U.S.C. § 1060(a)(3), a

common law trademark can be assigned orally. <u>Martha Graham</u>

<u>School and Dance Foundation, Inc. v. Martha Graham Center of</u>

<u>Contemporary Dancy, Inc.</u>, 43 F. App'x 408, 413 (2d Cir. 2002).

In this case, MACCG claims that Mr. Skenderi, with the consent

of Mrs. Skenderi as the sole member of Ardian Corporation,

assigned the TAVERNA KYCLADES word mark and design mark prior

to GCCA's registration of the TAVERNA KYCLADES Trademarks.

36. To prevent a party from using self-serving testimony to gain

ownership of a trademark, courts require strong evidence of

intent to assign the trademark, including precisely when and

how the assignment occurred as well as conduct that "manifests

agreement" to assign the trademark. <u>Warden v. Falk</u>, 2011 WL

3204815, at *6 (E.D. Pa. July 27, 2011) (citing <u>TMT N. Am.,</u>

<u>Inc. v. Magic Touch GmbH</u>, 124 F.3d 876, 884 (7th Cir. 1997));

<u>see</u> <u>Page Plus of Atlanta, Inc. v. Owl Wireless, LLC</u>, 602 F.

App'x 232, 235-36 (6th Cir. 2015); <u>Excell Consumer Prod. Ltd.</u>

v. Smart Candle LLC, 2013 WL 4828581, at *22 (S.D.N.Y. Sept.
10, 2013), opinion supplemented on denial of reconsideration,
2014 WL 1796657 (S.D.N.Y. May 5, 2014); see also Software AG,
Inc. v. Consist Software Solutions, Inc., 2008 WL 563449, at
*17 (S.D.N.Y. Feb. 21, 2008). Without documentary evidence,
the assignment "may be proven by the clear and uncontradicted
oral testimony of a person in a position to have actual
knowledge." 3 J. Thomas McCarthy. McCarthy on Trademarks and
Unfair Competition § 18.4 (5th ed. 2022).

37. The defendant has failed to prove an oral assignment of the
TAVERNA KYCLADES Trademarks from GCCA (or a predecessor in
interest) to MACCG. The defendant concedes that there is no
written manifestation of such an assignment, see Trial Tr.
279-80, and has failed to show an agreement on even the most
basic terms of the assignment, certainly not the "strong
evidence" of an intent on GCCA's part to assign the trademarks
by conduct manifesting an agreement to transfer rights. The
testimony offered by John Pappas, the defendant's only witness
concerning the alleged assignment, was not credible. In
contrast, Mr. Skenderi's testimony was clear and consistent,
and directly contradicted John Pappas' claimed terms. The fact
that GCCA openly applied for and obtained a registration for
the marks supports Mr. Skenderi's testimony that there was no
assignment. The use of the marks by the Bayside restaurant

further supports the conclusion that there was no assignment. Similarly, the fact that the MACCG lawyers did not assert that there was such an assignment when they contested the cease and desist letter provides further confirmation that there was no assignment.

38. At the time of the purported assignment, the TAVERNA KYCLADES word and design marks were owned by Ardian Corporation, not GCCA, or any other entity owned in whole or in part by Mr. Skenderi. Accordingly, any assignment by Mr. Skenderi, unless authorized by Mrs. Skenderi, was invalid. See Nordco A.S. v. Ledes, 1997 WL 570546, at *3 (S.D.N.Y. Sept. 15, 1997) (finding no valid assignment of trademark rights on the ground that "there is no document conveying title or ownership of the trademark to [the plaintiff]"), and Mrs. Skenderi testified that she never authorized an assignment of the TAVERNA KYCLADES Trademarks, see Trial Tr. 216-17.

39. Rather than manifesting an intent to assign the TAVERNA KYCLADES Trademarks to MACCG, the parties' conduct is strong evidence contrary to any alleged assignment. The conduct of the parties subsequent to the opening of the MACCG restaurant in Manhattan, specifically GCCA's continued use of the marks in its Astoria restaurant and subsequently in its Bayside restaurant without the participation of or complaint by MACCG or the Pappas family (or any licensing of the marks by GCCA to

MACCG for such use), is consistent only with GCCA's continued and uninterrupted ownership of the trademarks. Not only is the defendant charged with constructive notice of the TAVERNA KYCLADES trademark application and registration, the facts clearly indicate that, had the defendant truly owned the TAVENRA KYCLADES Trademarks, it would either have filed its own trademark application or done a search and had actual knowledge of the TAVERNA KYCLADES trademark application and registration by GCCA. Had the defendant truly been the owner of the TAVERNA KYCLADES Trademarks by assignment of the trademark from Ardian Corporation, the defendant could have opposed the registration by GCCA after the mark was published for opposition in 2014, or moved to cancel the registration of the trademark at any time prior to the initiation of this lawsuit. The Lanham Act provides that "[a]ny person who believes that he would be damaged by the registration of a mark" on the Principal Register may file an opposition. 15 U.S.C. § 1063. But, the defendant did not oppose the registration when the defendant learned of the opening of a second TAVERNA KYCLADES restaurant without its participation, or when Mr. Skenderi advised that he was leaving the business and terminating the defendant's rights to use the TAVERNA KYCLADES Trademarks in connection with the East Village restaurant.

40. The "defense of unclean hands applies only with respect to the right in suit." Warner Bros. v. Gay Toys, Inc., 724 F.2d 327, 334 (2d Cir. 1983); see ECF No. 10 at 7 (Affirmative Defense ¶ 3). Thus, in a trademark infringement case the "alleged unclean hands must relate to [the plaintiff's] acquisition or use of the . . . trademark. . .." Gidatex, S.r.L. v. Campaniello Imps., Ltd., 82 F. Supp. 2d 126, 131 (S.D.N.Y. 1999) (emphasis in original). In this case, the defendant's unclean hands defense is premised on the same meritless theory that GCCA "assigned" its trademark rights to MACCG, in spite of GCCA's open and continuous use of the marks in contravention of that fiction. The defendant cannot establish the requisite inequitable conduct, and the defendant's unclean hands defense cannot prevent GCCA's entitlement to injunctive relief. See id. at 133.

41. The defense of equitable estoppel requires that defendants prove "(1) a misrepresentation by the plaintiff, (2) reasonable reliance by the defendant, and (3) prejudice." River Light V, L.P. v. Olem Shoe Corp., 2022 WL 4484575, at *12 (S.D.N.Y. Sept. 27, 2022), on reconsideration in part, 2022 WL 16722210 (S.D.N.Y. Nov. 4, 2022) (citing Veltri v. Bldg. Serv. 32B-J Pension Fund, 393 F.3d 318, 326 (2d Cir. 2004)); Gucci Am., Inc. v. Guess?, Inc., 868 F. Supp. 2d 207, 244 (S.D.N.Y. 2012); Amron v. Yardain Inc. Pension Plan, 2019

WL 6619107, at *7 (S.D.N.Y. Dec. 5, 2019). And, "[t]o establish waiver under New York law one must show that the party charged with waiver relinquished a right with both knowledge of the existence of the right and an intention to relinquish it." Voest-Alpine Int'l Corp. v. Chase Manhattan Bank, 707 F.2d 680, 685 (2d Cir. 1983). The defendant has not shown affirmative conduct by GCCA inconsistent with its intent to enforce its trademark rights, inducing the belief that GCCA had abandoned its claim against the defendant. See ECF No. 10 at 7 (Affirmative Defenses ¶¶ 4-7). Nor has the defendant established detrimental reliance on any assurance that GCCA would never assert an infringement claim regardless of the quality of the services provided in connection with the TAVERNA KYCLADES marks. See Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co., 2019 WL 4199842, at *7-8 (S.D.N.Y. Aug. 15, 2019).

42. The defendant's argument that GCCA has abandoned the TAVERNA KYCLADES Trademarks by failing to police defendant's quality control fails on the facts. See ECF No. 10 at 7 (Affirmative Defense ¶ 7). The defendant's own testimony establishes that Mr. Skenderi, as GCCA's representative, was "excellent" at controlling the quality of the services used in connection with the TAVERNA KYCLADES Trademarks at the East Village restaurant from 2013 until January 2020 when GCCA terminated

MACCG's permission to use the TAVERNA KYCLADES marks. <u>See</u>
Trial Tr. 304.

43. The defendant's affirmative defenses to the effect that GCCA
did not act timely to assert its rights are likewise without
merit. <u>See</u> ECF No. 10 at 7 (Affirmative Defense ¶ 9); <u>Excelled
Sheepskin & Leather Coat Corp.</u>, 2019 WL 4188842, at *7-8. The
oral license continued in place for years while the business
relationship was satisfactory to the members of GCCA, and the
quality of the services in the East Village restaurant was
acceptable. Mr. Skenderi and GCCA gave prompt notice of
termination when the quality of services offered under the
marks at the Manhattan restaurant declined and became
unacceptable. Moreover, there is no evidence in the record of
any historic assurance by GCCA or Mr. Skenderi that they would
never terminate the license when it threatened the goodwill of
the marks and would never assert an infringement claim when
the license was terminated. Thus, the defendant cannot claim
that it relied to its detriment on any such representation.

MACCG'S COUNTERCLAIMS

44. MACCG asserted two counterclaims in its Answer to GCCA's
complaint, <u>see</u> ECF No. 10 at 17 ¶¶ 56-67, seeking a
declaratory judgment of non-infringement of trademark, 28
U.S.C. § 2201(a) and 15 U.S.C. § 1051 <u>et</u> <u>seq.</u>, and

cancellation of U.S. Trademark Registration pursuant to 15
U.S.C. § 1064.

45. The defendant failed to establish entitlement to a
declaratory judgment that GCCA's registration of the marks was
procured by fraud upon the USPTO. Cancellation of a registered
mark is warranted only when the party seeking registration
knowingly and falsely represented a belief that it possessed a
superior right to the mark, and such a showing must be made by
clear and convincing evidence. See 15 U.S.C. §§ 1064, 1115(b);
Burkina Wear, Inc. v. Campagnolo, S.R.L., 2011 WL 70563, at *3
(S.D.N.Y. Jan. 7, 2011). The record establishes that GCCA and
its predecessor in interest continually used the mark long
before engaging in negotiations with the defendant for a MACCG
restaurant in Manhattan, see e.g., Trial Tr. 206, 217, and
there is no contemporary documentary evidence of a claim to
the mark by the defendant or any modicum of evidence that
either Mr. or Mrs. Skenderi believed that the TAVERNA KYCLADES
Trademarks had been assigned to the defendant and that they
fraudulently sought to register the TAVERNA KYCLADES
Trademarks. The conduct of the parties with respect to GCCA's
exclusive use of the marks in its Queens restaurants, from
2013 until the present dispute, negates any inference of
fraudulent intent by GCCA in the application, much less clear
and convincing evidence of such intent. Orient Exp. Trading

Co., Ltd. v. Federated Dep't. Stores, Inc., 842 F.2d 650, 653
(2d Cir. 1988) ("The allegedly fraudulent statements may not
be a product of mere error or inadvertence, but must indicate
a 'deliberate attempt to mislead the [USPTO].'").

46. The defendant has failed to establish an "irrevocable" right
to use GCCA's TAVERNA KYCLADES Trademarks. The defendant
concedes that the only grant of permission to the defendant to
use the marks is derived from oral communications, and there
is no written instrument, irrevocable or otherwise. Assuming,
as the circumstances suggest, that the parties reached an oral
agreement to license use of the marks for the East Village
restaurant for an indefinite period, such an agreement cannot
be irrevocable; by law it is terminable at-will by the
licensor. Dial-A-Mattress Operating Corp. v. Mattress Madness,
Inc., 847 F. Supp. 18, 19 n. 1 (E.D.N.Y. 1994). In this case,
GCCA gave notice of its intent to revoke the license in
connection with its duty to control the quality of services
provided under the marks. See Laugh Factory v. Basciano, 608
F. Supp. 2d 549, 556 (S.D.N.Y. 2009). That continuing duty,
moreover, is simply inconsistent with an "irrevocable" right
on the part of a licensee, because a trademark licensor that
fails to control the quality of services under the mark will
cause the trademark to be considered abandoned.

47. In addition, any oral agreement to license the mark in perpetuity without any termination date or terms violates the Statute of Frauds. <u>See</u> N.Y. Gen. Obligations Law § 5-701. Because the alleged perpetual license agreement could not "be performed within one year from the making thereof," <u>see</u> <u>id.</u>, it is subject to the Statute of Frauds' requirement that it be reduced to (or evidenced by) a signed writing. <u>See</u> <u>Full Circle United, LLC v. Skee-Ball, Inc.</u>, 2014 WL 12829195, at *7 (E.D.N.Y. May 13, 2014). In these circumstances, partial performance also does not remove a contract from being subject to the Statute of Frauds. <u>See</u> <u>Roberto Coin, Inc. v. Goldstein</u>, 2021 WL 4502470, at *14 (E.D.N.Y. Sept. 30, 2021).

## CONCLUSION

GCCA has proved by a preponderance of the evidence that it is entitled to a judgment finding that MACCG has violated GCCA's rights under 15 U.S.C. § 1114, 15 U.S.C. § 1125(a), and common law unfair competition. GCCA has failed to prove that MACCG has committed trademark dilution under 15 U.S.C. § 1125(c).

MACCG's counterclaims seeking a declaratory judgment of non-infringement of trademark and cancellation of trademark registration should be dismissed. GCCA has waived any claim for damages and seeks only injunctive relief. GCCA should submit a proposed judgment within seven (7) days of the date of this

opinion. MACCG may submit any objections or a counter-judgment three (3) days thereafter.

**SO ORDERED.**

Dated:     New York, New York
              February 28, 2024

                                     John G. Koeltl
                        United States District Judge